UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| KENNETH L. SMITH, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:14CV140 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Court affirms the decision of the Commissioner.

### I. Procedural History

On September 13, 2012, Plaintiff filed an application for DIB alleging disability beginning August 10, 2012 due to severe insomnia, severe social anxiety disorder, and borderline intellectual functioning. (Tr. 13, 55-56, 98-99) The application was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 43-62) On February 19, 2014, Plaintiff testified at a hearing before the ALJ. (Tr. 26-42) On April 4, 2014, the ALJ determined that Plaintiff had not been under a disability from August 10, 2012 through the date of the decision. (Tr. 13-22) Plaintiff then filed a request for review, and on August 14, 2014, the Appeals Council denied Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the February 19, 2014 hearing before the ALJ, Plaintiff appeared without an attorney. Plaintiff acknowledged his right to obtain counsel but stated his desire to go forward with the hearing unrepresented. Plaintiff testified that he was 30 years old. He finished the ninth grade and took special education classes. He took the test for his GED but did not pass. Plaintiff was able to read and write at a basic level. He was divorced and did not have children. He lived alone. Plaintiff did not have a driver's license and testified that he walked everywhere. He was previously in the Merchant Marines, and his last job was as a deck hand. Plaintiff testified that he stopped working because he had a nervous breakdown due to the stress of the job. He was unable to sleep. Plaintiff stated that he was still messed up and saw a psychologist twice a month. (Tr. 28-33)

Plaintiff testified that he was able to take care of his housework. He usually went out to eat, but he was able to cook. He had a computer but had problems understanding. He did not use any social networks. Plaintiff was able to shop for food and clothes. Plaintiff stated that he was unable to work because of his lack of social skills. He previously witnessed a murder and had been through a lot emotionally. When he was stressed at work, he felt as though the world was coming down on him. He became agitated and shaky, and he just wanted to be alone. Plaintiff further testified that he had been in and out of the ER and the psychiatric ward over the last several years. Plaintiff had friends but did not do much socializing with them. Plaintiff's doctor told him that he was narcissistic, which Plaintiff thought explained his difficulty being around certain people. Plaintiff did not date, but he had a supportive family. Plaintiff used to get along with co-workers but was more agitated around them after his breakdown. He had a decent relationship with his boss but thought his boss and co-workers were careful around him because

they were afraid he would snap. Plaintiff's co-workers did not typically complain about his work; however, when they did, his stress would build up. Plaintiff testified that he went to the hospital after an argument with his girlfriend. He had also been in the hospital a month ago. (Tr. 33-38)

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to assume an individual the same age, educational background, and work history of the Plaintiff. He had exertional limitations limited to jobs consisting of simple, routine, and repetitive tasks. In addition, while he could work in close proximity to others, he was limited to jobs that did not require close cooperation and interaction with co-workers. He could have only occasional interaction and cooperation with the general public. Further, the individual retained the ability to maintain attention and concentration for a minimum of two hour periods at a time, as well as adapt to changes at the workplace on a basic level instead of supervision. Given this hypothetical, the VE testified that the individual could perform Plaintiff's past work as hanger. In addition, he could work as a tumbler operator, boring machine tender, and finisher operator. These jobs were medium unskilled occupations. If the ALJ added that the individual was unable to consistently interact and cooperate with co-workers and supervisors, he would be unable to perform those or any other jobs. (Tr. 38-41)

In a Function Report – Adult dated September 25, 2012, Plaintiff stated that he could not be around other people. He was able to care for his personal needs but did not cook. He went outside all the time. Plaintiff walked but did not drive due to a DWI. He did not like to shop, and he did not spend time with others. He reported that he had problems getting along with family, friends, and others and that they hated being with him. Plaintiff's conditions affected his ability to understand, follow instructions, and get along with others. He was unable to pay

attention at all. He could not follow written instructions, and he did not follow spoken instructions very well. Plaintiff was fired from his job at Tyson Tools because he had problems getting along with others. He could not handle stress or changes in routine. Plaintiff stated that he wished he could work, but he was unable to take the stress. (Tr. 141-51)

### III. Medical Evidence

In 1999, when Plaintiff was in eighth grade, he underwent intellectual testing through the Poplar Bluff school district. His verbal IQ was 70; his performance IQ was 65; and his full scale IQ was 65. The evaluation indicated that he was functioning at the intellectually deficient range. School records showed that problems academically, he did not exhibit social or behavioral problems. (Tr. 207-95)

On September 23, 2006, Paul W. Rexroat, Ph.D., performed a consultative psychological examination of Plaintiff. Dr. Rexroat noted that Plaintiff presented an adequate appearance, with appropriate dress and general well-grooming. Plaintiff was socially confident and comfortable in his interactions with Dr. Rexroat. He generally understood instructions. He exhibited an appropriate attitude towards the evaluation and maintained good interest and effort. Dr. Rexroat assessed a verbal scale IQ of 72, performance scale IQ of 59, and full scale IQ of 64, which fell within the extremely low (mild mental retardation) range of intellectual abilities. Dr. Rexroat opined that Plaintiff could understand and remember simple instructions and sustain concentration and persistence with simple tasks. He had marked limitations in his ability to interact socially and moderate limitations in his ability to perform basic activities of daily living. Further, Dr. Rexroat did not believe Plaintiff could manage his own money because of his low level of intelligence. Dr. Rexroat diagnosed panic disorder without agoraphobia; mild mental retardation; occupational, financial, and educational problems; and a Global Assessment

4

Functioning ("GAF") score of 54.[1] Plaintiff's motivation was good, and his prognosis was guarded. (Tr. 299-303)

On October 9, 2012, Ben Lanpher, Ph.D., a licensed psychologist, performed a psychological evaluation at the request of Disability Determinations. Plaintiff reported that he had not received mental health counseling but had been prescribed psychotropic medications in the past. His current symptoms included generalized anxiety and social isolation. He described being shaky and panicky when around other people. He experienced episodes of anger and irritability, which had increased over the past year and a half. Plaintiff also reported symptoms of depression, including sleep problems and feelings of inadequacy. Dr. Lanpher noted that Plaintiff appeared to be functioning within the borderline range of intellectual ability. However, past records revealed an IQ score in the range of mild mental retardation. Plaintiff appeared to have a severe learning disability in written expression. He also exhibited symptoms of social anxiety and depression. Dr. Lanpher assessed social phobia; depressive disorder, NOS;

---

[1] The Court notes that the Diagnostic and Statistical Manual of Mental Disorders ("DSM")-V was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki*, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)). However, because the DSM-IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." *Rayford*, 2013 WL 3153981, at *1 n.2.

Under the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 31 to 40 indicates "some impairment in reality testing or communication . . . OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood . . . ." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* 34 (4th ed. 2000). A GAF of 41 to 50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," and a GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

5

borderline intellectual functioning, rule out mild mental retardation; borderline hypertension and high cholesterol; possible heart problem; problems in social network, severe; and a GAF of 47. Dr. Lanpher opined that Plaintiff was moderately to markedly impaired in his ability to understand instructions; mildly to moderately impaired in his ability to remember instructions; moderately to markedly impaired in his ability to sustain concentration; markedly impaired in his ability to interact socially; moderately to markedly impaired in his ability to adapt to his environment and persist in tasks; and capable of managing his finances. (Tr. 322-25)

Charles W. Watson, Psy. D., the non-examining medical consultant, evaluated Plaintiff's claim on November 15, 2012 and determined that the Dr. Lanpher's opinion was entitled to some weight but not significant weight. Dr. Watson noted inconsistencies between the stated abilities and the objective data provided by Dr. Lanpher. Further, the opinion was inconsistent with Plaintiff's recent work history. Dr. Watson noted that Plaintiff's adaptive function was inconsistent with mild mental retardation and that he was able to work despite his anxiety. In addition, Plaintiff had not pursued treatment for anxiety. Dr. Watson opined that Plaintiff's impairments did not meet the listings criterion for mental retardation, anxiety, or substance addiction disorders. Dr. Watson concluded that Plaintiff retained the capacity to acquire and retain simple instructions and sustain concentration and persistence with simple, repetitive tasks. Further, Plaintiff appeared to have the capacity to adapt to changes in settings that did not require frequent contact with the public or very close interactions with others in the workplace. (Tr. 43-54)

On November 20, 2012, Plaintiff presented to the ER complaining that he believed someone drugged him at a bar. Plaintiff appeared anxious and requested diazepam to calm him down. He reported using street drugs and cocaine on occasion. His mood was cooperative. Lab

6

results were negative, and Plaintiff was discharged in stable condition and encouraged to seek outpatient help from a family practitioner. (Tr. 402-07) Plaintiff returned to the ER on November 23, 2012 seeking alcohol detoxification. He was discharged the same day with a diagnosis of anxiety and alcoholism. Plaintiff was referred to an outpatient drug and alcohol rehabilitation facility. (Tr. 397-401) On December 25, 2012, the police brought Plaintiff to the ER for alcohol intoxication and homicidal ideation. (Tr. 388-91)

Plaintiff was admitted to the hospital on May 8, 2013 after presenting to the ER feeling suicidal and mildly homicidal. He stated that he argued with his mother and became enraged at her and his stepfather. Diagnoses upon admission were cyclothymic disorder, major depression, generalized anxiety, and a GAF of 35. Plaintiff reported that he was not as serious drinker. He was given Tegretol and Celexa, after which his affect brightened, and his mood stabilized. Plaintiff was discharged the following day with a diagnoses of major depression, severe, recurrent; mild narcissistic personality; and a GAF of 40. (Tr. 328-38, 373-83) Plaintiff returned to the ER on November 1, 2013 for complaints of drug abuse. He was discharged that same date in stable condition with a diagnosis of substance abuse. (Tr. 369-72)

Plaintiff began treatment with John Wood, Psy. D., on November 4, 2013, after Plaintiff witnessed his mother shoot and kill his stepfather in May 2013. He reported experiencing a feeling of helplessness and detachment. He was startled by loud noises. Dr. Wood noted that Plaintiff met some of the PTSD criteria but that some of his problems could have been present prior to the incident. Plaintiff reported drinking 10 to 20 beers per day, along with occasional mixed drinks. He previously used cannabis and cocaine but denied current drug use. Dr. Wood noted that Plaintiff's speech was clear, but his organization of thought was loose and rambling. His affect was constricted, and he seemed detached when talking about the incident. Dr. Wood

further noted that Plaintiff did not appear to be in acute distress. He did not exhibit abnormal mental trends involving delusions or hallucinations or any homicidal and suicidal ideation. Dr. Wood assessed PTSD (mild), mood disorder, and personality disorder. (Tr. 409-10)

Plaintiff returned to Dr. Wood on November 19, 2013. Plaintiff reported continued problems with sleep disturbance and disturbing thoughts. He reported drinking 30 beers a day at one time but now drank a case of beer per week. Dr. Wood assessed Plaintiff's alcohol use as a means of self-medicating. He diagnosed PTSD; mood disorder, NOS; and personality disorder, NOS. On December 3, 2013, Plaintiff reported improved sleep. However he replayed seeing his mother shoot his stepfather when drifting to sleep. Plaintiff returned to Dr. Wood on December 18, 2013. Plaintiff believed he was making progress but at a slow rate. He was still startled by loud noises, and he continued to drink but thought his drinking was not excessive. Dr. Wood opined that Plaintiff seemed to minimize his alcohol use. (Tr. 414-20)

On January 11, 2014, Plaintiff presented to the ER and was admitted by court order to the mental health unit. Plaintiff claimed that someone put something in his drink. He reported occasional marijuana use and rare alcohol use. Upon mental status examination, Dr. Michelle Powers assessed psychosis, schizophrenia, possible alcohol dependence; Plaintiff's reported narcissistic personality diagnosis; and a GAF of 30. Plaintiff was discharged on January 14, 2014 with diagnoses of major depression with psychosis; antisocial personality with narcissistic traits; Leukocytosis; and a GAF of 45-50. Dr. David Fontaine noted that Plaintiff was no longer paranoid and instructed him to follow through with local mental health treatment. (Tr. 347-357)

Plaintiff saw Dr. Wood again on January 15, 2014. Plaintiff reported that someone spiked his drink because he did not take any drugs, yet the tested positive for barbiturates, methamphetamines, and opium. Dr. Wood noted that Plaintiff expressed some signs of paranoia

8

and/or delusional thinking. Plaintiff reported doing much better, with improved sleep and no nightmares involving the incident. He acknowledged that alcohol use caused him some problems but did not view his use of alcohol as problematic. On January 29, 2014, Plaintiff reported sleeping for a few hours, waking up for a while, and falling back asleep for a few more hours. He reported doing better overall. He cut back on his alcohol and drug use and was feeling better. He tried to get out and do things, sometimes with people he knew. Dr. Wood assessed PTSD, mood disorder NOS, and alcohol abuse. During an appointment on February 12, 2014, Plaintiff reported doing fairly well, with stable sleep. He continued to have flashbacks of the shooting but did not think that interfered with his ability to perform activities of daily living. He continued to limit his alcohol intake and drank only a 12 pack of beer since his last appointment. (Tr. 411-413)

## IV. The ALJ's Determination

In a decision dated April 4, 2014, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017. He had not engaged in substantial gainful activity since August 10, 2012, the alleged onset date. Plaintiff's severe impairments included borderline intellectual functioning, anxiety disorders, depression/mood disorders, personality disorder, and alcohol abuse. Nothing in the record supported Plaintiff's allegations of a medically determinable sleep disorder. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. The ALJ found mild restriction to activities of daily living; moderate difficulties with social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation which have been of extended duration. Therefore, Plaintiff's mental impairments did not satisfy "paragraph B" criteria. Further, the

9

ALJ found no evidence of chronic affective disorder of two years' duration resulting in marginal adjustment or inability to function outside a highly supportive living arrangement. He also found no evidence that Plaintiff's anxiety resulted in a complete inability to function outside the area of his home such that "paragraph C" criteria was not satisfied. (Tr. 13-17)

The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with some nonexertional limitations. Plaintiff was limited to jobs consisting of simple routine, repetitive tasks. He could work in proximity to others but was limited to jobs that did not require close cooperation and interaction with co-workers. The ALJ stated that Plaintiff would work best in relative isolation. Plaintiff was limited to only occasional interaction and cooperation with the general public. He could maintain attention and concentration for minimum 2 hour periods at a time, adapt to changes in the workplace on a basic level, and accept supervision on a basic level. (Tr. 17-20)

Although Plaintiff was unable to perform any past relevant work, considering his younger age, limited education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. The ALJ relied on the VE's testimony to find Plaintiff could work as a tumbler operator, boring machine tender, and finisher operator. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from August 10, 2012 through the date of the decision. (Tr. 20-22)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

10

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints

11

regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[2] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

---

[2] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

## VI. Discussion

Construing Plaintiff's *pro se* Complaint liberally, Plaintiff appears to argue three points of error. *Jackson v. Nixon*, 747 F.3d 537, 544 (8th Cir. 2014). First, Plaintiff asserts that the ALJ failed to give proper weight to the expert opinions in the case. Second, Plaintiff maintains that the ALJ did not properly rely on the VE's testimony in finding that he could perform other work because the VE testified there were no jobs Plaintiff could perform. Finally, Plaintiff argues that the overwhelming evidence shows that he has a narcissistic personality disorder that is difficult to treat and entitles him to benefits.

At the outset, although Plaintiff does not raise this argument in his brief, the Court notes that the ALJ properly determined that Plaintiff did not meet or medically equal the severity of Listing 12.05 for Intellectual Disability. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.[3] The ALJ found that school records indicated learning problems in all areas of academic functioning. However, teachers observed that he could function normally in the social arena, and special education teachers were working with him to develop basic life skills. The ALJ noted that, despite a full scale IQ score of 64 in 2006, he was able to work for 5 years at a barge company and 5 years prior to that at a food processing plant. In addition, he could cook meals and perform household chores. Finally, Dr. Charles Watson opined that Plaintiff's adaptive

---

[3] The required level of severity for an intellectual disability is met where a claimant shows:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

13

functioning was inconsistent with mild mental retardation. (Tr. 17) "Working generally demonstrates an ability to perform a substantial gainful activity." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005); *see also Rock v. Colvin*, No. 2:14-CV-00078 JAR, 2015 WL 5560279, at *7 (E.D. Mo. Sept. 21, 2015) ("the ability to maintain employment with an impairment together with the absence of evidence that the condition has significantly deteriorated, tends to prove the impairment was not disabling). Further, an ability to engage in a number of daily activities detracts from Plaintiff's credibility. *See, e.g., Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (discounting the plaintiff's subjective complaints where the plaintiff engaged in extensive daily activities such as fixing meals, doing housework, shopping for groceries, and handling money). The ALJ properly gave significant weight to Dr. Watson's opinion because the opinion was consistent with the overall evidence in the record. *See Brooks v. Colvin*, No. 4:13CV588 TIA, 2014 WL 4385429, at *14 (E.D. Mo. Sept. 4, 2014) ("[W]here opinion evidence obtained from a non-examining physician is consistent with substantial evidence on the record as a whole, an ALJ does not err in according this opinion evidence significant weight."). Thus, Plaintiff does not satisfy the requirements of paragraph C.

With regard to paragraph D, the ALJ noted that Plaintiff had mild restrictions in activities of daily living, evidenced by the fact that he lived on his own, could handle his personal care, could shop for his own needs, and could perform household chores. Further, Plaintiff had moderate difficulties with social functioning. Although he alleged getting along poorly with co-workers, he had friends and previously had a girlfriend in 2013. With regard to concentration, persistence, or pace, the ALJ found only moderate difficulties, as Plaintiff could focus on reading a simple article and use the computer, as well as demonstrate good calculation and memory. Finally, the ALJ found no episodes of decompensation of extended duration. Thus, the ALJ

14

properly found that Plaintiff did not have 2 marked limitations and did meet the criteria of Listing 12.05 paragraph D. (Tr. 16)

## A. Weight Given to Medical Opinion Evidence

Plaintiff appears to argue that the ALJ failed to afford proper weight to the expert opinions in this case. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, the record shows that the ALJ thoroughly considered the medical records and gave proper weight to the medical opinion evidence. As mentioned above, Dr. Watson opined that Plaintiff retained the ability to acquire and retain simple instructions; could sustain concentration and persistence with simple instructions; and could adapt to changes in settings not requiring

frequent public contact or very close contact with others. The ALJ noted that this opinion was entitled to significant weight because the opinion was consistent with the evidence contained in the record. As stated above, Plaintiff was able to perform many activities of daily living and hold two consecutive jobs for 5 years each. Additionally, he socialized with friends and relatives. (Tr. 18-19)

With regard to Dr. Lanpher, the ALJ gave the diagnoses significant weight, but noted that assessed limitations of moderate to marked limitations in Plaintiff's ability to understand instructions, sustain concentration, adapt, and interact socially were entitled to little weight. The ALJ found that those suggested limitations were inconstant with Dr. Watson's analysis and with Dr. Lanpher's own treatment notes. (Tr. 19) For instance, Dr. Lanpher opined that Plaintiff had borderline intellectual functioning as opposed to mild retardation. Further, he noted Plaintiff's past employment and extensive activities of daily living. Finally, he appeared to base his opinions on Plaintiff's subjective reports, as the objective data was inconsistent with the abilities determined by Dr. Lanpher. *See Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (finding the ALJ properly discounted the consulting psychologist's opinion where it was based on plaintiff's subjective complaints and not objective findings and was inconsistent with the psychologist's own notes). With regard to Dr. Rexroat's evaluation, the ALJ noted that the consultation occurred several years before the relevant period, and thus the ALJ gave the opinion little weight. (Tr. 19)

The ALJ further evaluated Plaintiff's mental health treatment with Dr. Wood after Plaintiff witnessed his mother shoot and kill his stepfather. Dr. Wood assessed PTSD, although he noted that Plaintiff did not fully meet the criteria. Dr. Wood also assessed a mood disorder, personality disorder, and alcohol abuse, noting that Plaintiff minimized his alcohol use.

16

However, Dr. Wood did not assess any type of intellectual disability, and he did not indicate any worsening of symptoms. (Tr. 19-20)

In short, the Court finds that the ALJ properly assessed the medical opinion evidence in the record and assigned appropriate weight to those opinions in determining Plaintiff's RFC. *See Davis v. Apfel*, 239 F.3d 962, 967-68 (8th Cir. 2001) (finding that the ALJ may reject medical expert conclusions where they are inconsistent with the record as a whole and may properly base the RFC finding on opinion evidence that is consistent with the record evidence). The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v.Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Therefore, Plaintiff's first ground for reversal is denied.

### B. Testimony from the VE

Next, Plaintiff claims that the ALJ did not properly rely on the VE's testimony in finding that Plaintiff could perform other work because the VE testified there were no jobs Plaintiff could perform. The record shows that the ALJ's hypothetical included limitations found in the record and in the RFC determination. The ALJ limited Plaintiff to jobs consisting of only simple, routine, repetitive tasks; no close cooperation and interaction with co-workers; only occasional interaction and cooperation with the general public; allow maintenance of attention and concentration for a minimum of two hours at a time; and allow adaption to changes at the basic level instead of supervision. (Tr. 39) The VE testified that other jobs existed which Plaintiff could perform. When asked whether the individual could perform those jobs if he was unable to consistently interact and co-operate with co-workers and supervisors, the VE answered that no jobs would exist. (Tr. 40)

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey*, 622 F.3d at

17

922 (citation omitted). Here, the evidence demonstrated that Plaintiff was able to work in proximity to others and could accept supervision on a basic level, not that he was precluded from consistent interaction with others. Indeed, Plaintiff was previously able to work for 5 years at a barge company and 5 years in a food processing plant. Further, he had friends and a supportive family. Therefore, the ALJ determined that Plaintiff retained the RFC to work in jobs that required limited interaction with co-workers and supervisors, as supported in the evidence of record. "[A]n ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments 'significantly restricted his ability to perform gainful employment.'" *Owen v. Astrue*, 551 F.3d 792, 802 (8th Cir. 2008) (quoting *Eurom v. Chater*, 56 F.3d 68 (8th Cir. 1995)). Because the hypothetical question to the VE incorporated those limitations found by the ALJ and supported by the evidence, the question "'capture[d] the concrete consequences of [Plaintiff's] impairments.'" *Hulsey*, 622 F.3d at 922 (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). Thus, the VE's answer constitutes substantial evidence and supports the ALJ's determination that Plaintiff could perform other work and was not disabled. *Buckner*, 646 F.3d at 561.

### C. Plaintiff's Personality Disorder

Last, Plaintiff argues that the overwhelming evidence shows that he has a narcissistic personality disorder that is difficult to treat and entitles him to benefits. Here, the ALJ found that, while Plaintiff had a severe personality disorder, such disorder did not preclude Plaintiff from performing work. The ALJ noted that Plaintiff did not follow up with advice to obtain outpatient care or medication for his personality disorder. Other than seeing Dr. Wood after Plaintiff witnessed the murder of his stepfather, Plaintiff did not seek treatment for his mental health issues upon release from the hospital and encouragement to follow up with outpatient

18

treatment. "The absence of any evidence of ongoing counseling or psychiatric treatment or deterioration or change in [Plaintiff's] mental capabilities disfavors a finding of disability." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).

Further, the ALJ noted Plaintiff's extensive activities of daily living and fair social abilities supported a finding that Plaintiff could perform simple work activity with reduced social contact. *See Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (noting that the plaintiff was able to engage in physically and intellectually challenging tasks despite her low IQ such that substantial evidence supported the ALJ's finding that plaintiff was not significantly limited by physical or mental impairments). The Court therefore finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled by his personality disorder or any other mental or intellectual impairment. Thus, the Court affirms the final decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 1st day of March, 2016.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**